# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:16-cr-185-SI |
| v. | **OPINION AND ORDER** |
| **WES EDWARD HAMMAN**, | |
| Defendant. | |

Billy J. Williams, United States Attorney, and Scott M. Kerin, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF OREGON, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for the United States of America.

Per C. Olson, HOEVET OLSON HOWES, PC, 1000 SW Broadway, Suite 1500, Portland, OR 97205. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

On January 24, 2017, after a five-day trial, a jury returned a verdict finding the

Defendant, Wes Edward Hamman ("Hamman"), guilty of bank robbery. Shortly after the

Government filed charges against Hamman, the Court appointed counsel to represent him. After

Hamman requested the appointment of a different attorney, the Court spoke with Hamman

outside of the presence of the Government, agreed to appoint a different attorney to represent

Hamman, and advised Hamman that the Court almost certainly would not appoint a third

attorney for Hamman if he became dissatisfied with his second court-appointed attorney. Approximately one month before trial, Hamman asked to represent himself at trial and have his second court-appointed attorney serve as standby counsel. The Court held a *Faretta* hearing, during which Hamman explained that he wanted to present his "side" to the jury without having the jury learn about his "past." Hamman expressed no difficulties or concern about working with his second appointed counsel, whom Hamman wanted to continue in the role of standby counsel. Hamman also did not indicate in any way that he wanted the Court to consider appointing a new (third) attorney to represent him at trial. After confirming that Hamman's request to represent himself was made knowingly, voluntarily, and unequivocally, the Court granted Hamman's request. After the jury returned its verdict, Hamman asked that his standby counsel be appointed to represent him for sentencing. The Court agreed. Before sentencing, however, Hamman's second counsel moved to withdraw, and Hamman requested the appointment of new counsel (his third). The Court agreed. More than three months after the jury rendered its verdict, Hamman, through his third court-appointed counsel, filed a motion for new trial. Hamman argues, among other things, that the Court denied Hamman his Sixth Amendment right to counsel. For the following reasons, Hamman's motion is denied.

## STANDARDS

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A motion for a new trial is directed to the discretion of the district judge. It should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 553 (1st ed. 1969)). There are two alternative filing deadlines that may apply to a motion for new trial, depending on the grounds for the motion. First, "[a]ny motion for a new

trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). Second, "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). When an act may be done within a specified period, however, the court may extend the time for good cause on a party's motion "after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).

## BACKGROUND

### A. Pretrial

On April 22, 2016, Hamman made his initial appearance following a criminal complaint. At the hearing, a U.S. Magistrate Judge appointed Assistant Federal Public Defender Francesca Freccero as counsel for Hamman. On April 26, 2016, a grand jury indicted Hamman, charging him with one count of bank robbery in violation of 18 U.S.C. § 2113(a).

More than six months later, on November 2, 2016, Hamman filed a *pro se* motion asking the Court to appoint new counsel. The Court held a hearing and spoke with Hamman outside the presence of the prosecution. After some discussion, the Court said to Hamman: "I am going to ask you, do you still want me to appoint a new attorney for you. If you say yes, I'm going to, but it will also come with the following caveat: I am not going to do [it] a third time. I'm not going to do it again after this." ECF 125 at 11:21-25. The Court also explained to Hamman:

> You either have to stay with that second attorney or you have to tell me that you want to represent yourself. If you want to represent yourself and you are aware of the challenges and the difficulties of doing that—and by the way, if you do want to represent yourself, I am going to give you all the reasons why you shouldn't, because that's not a good idea at trial. But if you really want to represent yourself, I will let you do it, as long as you understand the risks. If you want to continue with your second attorney, that will be fine too. But if you tell me you want a third attorney, *I'm almost certainly* going to say no. I will give you have [*sic*] two shots, and takes [*sic*] [that's] it.

ECF 125 at 12:1-22 (emphasis added). The Court added that

> sometimes, for whatever [reason,] may be [*sic*] even personality
> reasons, an attorney and a client sometimes don't mesh. That's
> why I am generally pretty easy about giving someone a second
> attorney when there is [a] good reasons [*sic*] presented, but I also
> want to make sure you understand you are not going to get a third.

ECF 125 at 14:12-16.

The Court then relieved Ms. Freccero of her duties and invited the prosecution back into

the courtroom. Before the conclusion of the public hearing, the Court announced in open court:

> I did advise Mr. Hamman that I *generally* do not grant a third [*sic*]
> request for a third attorney; that I am authorizing a second attorney
> be appointed in this matter. I hope that the relationship works out
> well. But if for whatever reason it doesn't, *I almost certainly* will
> not appoint a third attorney. Mr. Hamman will they [*sic*] [then]
> have the option of continuing with the second attorney or choosing
> to be his own attorney, with all of the risks and difficulties that are
> attached to that choice.

ECF 125 at 24:24-25:7 (emphasis added). On November 4, 2016, the Court appointed Ernest

Warren, Jr. to represent Hamman as Hamman's second court-appointed counsel. ECF 42.

On December 14, 2016, Hamman, through Mr. Warren, filed several matters. First,

Hamman filed a motion to allow him to represent himself at trial with the assistance of

Mr. Warren as standby counsel. ECF 50, 51. Second, Hamman filed a Notice of Alibi Defense.

ECF 52. Third, Hamman filed a motion *in limine* to exclude hospital incident reports, statements,

and photographs, which the Government contended were admissible as evidence of an escape

attempt and, thus, consciousness of guilt. ECF 53, 54. The following day, Hamman filed several

more motions *in limine* seeking to exclude, among other things, what the Government contended

was evidence of Hamman trying to coordinate yet another escape attempt. ECF 55-58.

On December 29, 2016, the Court held a hearing, pursuant to *Faretta v. California*, 422

U.S. 806 (1975), on Hamman's motion to represent himself at trial with Mr. Warren serving as

standby counsel. ECF 66. At the *Faretta* hearing, the Court presented Hamman with a written checklist of rights and risks (ECF 67), and the Court reviewed that checklist orally with Hamman during the hearing. Hamman initialed and signed the checklist and confirmed that he understood the rights that he was waiving and the risks that he was accepting. The Court told Hamman that there were "a number of serious disadvantages that [he would] face by going forward without an attorney." ECF 112 at 15:1-3. The Court warned Hamman that "the rules and procedures of a trial—that includes the Federal Rules of Evidence and the Federal Rules of Criminal Procedure—they will still apply to you, even though you're not a lawyer." ECF 112 at 15:9-12. The Court also advised Hamman that he was giving up a number of benefits by deciding to represent himself. ECF 112 at 15:24-16:2. The Court told Hamman that "a trained lawyer would and will defend you far better than you can defend yourself, and I think it is unwise of you to try to represent yourself. . . . I strongly urge you and recommend that you not try to represent yourself." ECF 112 at 21:11-17. The Court explained basic trial procedures to Hamman and discussed how an attorney could represent Hamman at trial. ECF 112 at 16:21-19:4, 23:20-27:9.

Hamman stated that he understood the disadvantages of representing himself, as well as the benefits that he would be foregoing by choosing to represent himself. ECF 112 at 31:19-32:2. Hamman also explained the reason why he desired to represent himself:

> In order for me to stand in front of a jury or take the stand, my past is going to come up, and I think the only way to avoid that and tell my side of it is to represent myself. So that's what I'm going to do.

ECF 112 at 28:24-29:2.[1] At the conclusion of the *Faretta* hearing, the Court granted Hamman's request to represent himself at trial and his request to have Mr. Warren appointed as standby

---

[1] According to the Government's trial memorandum, Hamman had two prior felony convictions for robbery. In 2008, Hamman was convicted of robbery in the first degree, and in 2001 Hamman was convicted of robbery with a deadly weapon and being a felon in possession of a firearm. ECF 71 at 20. The Government stated that if Hamman chose to testify at

counsel. At no time during this hearing did Hamman say that he wanted a different attorney appointed for him (either as trial counsel or standby counsel), or give the Court any indication that he wanted to discuss anything about his attorney. Further, when Mr. Warren filed Hamman's motion to represent himself at trial (ECF 50, 51), Mr. Warren gave no indication to the Court that Hamman would have preferred not to represent himself at trial but instead wanted to have a different attorney appointed as trial counsel.

After the *Faretta* hearing, but before trial began, Hamman appeared before the Court three more times. The first was a pretrial conference held on January 5, 2017. ECF 81. The second was a pretrial conference held on January 13, 2017. ECF 85. The third was for the final pretrial conference held on January 17, 2017. ECF 88. At none of these hearings did either Hamman or Mr. Warren tell the Court that Hamman had any concerns regarding his standby counsel or any desire or interest in having the Court appoint different counsel for Hamman.

On January 18, 2017, however, the morning of the first day of trial, Hamman orally moved for a continuance. He stated:

> My son came up and spoke to me yesterday. He flew in from Phoenix. He has a check that just came through. So he was trying to get me a lawyer. He called on a few lawyers, and they told him I would have to postpone this in order for them to take it, and so I was going to ask if I could do that.

ECF 128 at 4:2-7. Hamman did not provide the Court with the name of any retained counsel who had agreed to represent him, if only a continuance would be granted, and no retained attorney appeared with Hamman to make such a representation and request directly to the Court.

---

trial, the Government would seek to impeach Hamman's credibility by presenting evidence of these two convictions to the jury. ECF 71 at 20. When Hamman explained that wanted to represent himself at trial to avoid having his "past" come up yet still being able to tell his "side" of the story, the Court understood that Hamman's "past" likely referred to his prior felony convictions.

The Court told Hamman that his motion to postpone trial was denied as untimely. ECF 128

at 4:8-9. The Court, however, allowed Hamman to be heard further. Hamman then explained:

> Ernest Warren [Hamman's standby counsel] has been pretty busy.
> I have seen his investigator maybe twice, and I've seen him quite a
> bit actually. But he still wasn't ready for trial—still wasn't—still
> aren't [*sic*] right now.
>
> I have asked [*sic*] to do many, many things, and I made a list. I
> asked for the list to be copied and be brought here, and I still
> haven't seen the list. It has a list of things that I needed for trial,
> and they still haven't got them. So I haven't done them.
>
> So I am asking to postpone this, because I'm not ready, and I need
> a fair trial.

ECF 128 at 6:1-11. Mr. Warren then showed the Court an electronic copy of Hamman's "list."

The Court reviewed Hamman's "list" and concluded:

> I don't see anything here that could not have been raised in a more
> timely fashion. I note that when we had our *Faretta* hearing,
> Mr. Hamman said nothing about wanting more time to retain a
> private attorney or otherwise. I don't even recall hearing anything
> about this *yesterday* when we spoke.

ECF 128 at 8:11-15 (emphasis added).

## B. Trial

At trial, the jury heard the following evidence. On April 20, 2016, at

approximately 12:30 p.m., a man entered the Key Bank located at 4131 S.E. Hawthorne

Boulevard, near S.E. 41st Avenue, in Portland, Oregon. Key Bank was insured by the FDIC. The

man approached one of the tellers. The man was wearing a baseball cap with a Batman logo,

sunglasses, and a surgical mask that covered much of his face. The man gave the teller a note

that said he had a gun and demanded money. Consistent with her training, the teller gave the

robber five twenty-dollar bills with serial-numbers pre-recorded (also known as "bait bills") and

a hidden electronic GPS tracking device. As soon as the tracking device is removed from the

teller's cash drawer, it automatically alerts law enforcement. The robber then demanded hundred-dollar bills and fifty-dollar bills. The teller complied. The robber fled. After the robbery, the teller's cash drawer was short $2,210.

Four-tenths of a mile from the bank, near the corner of S.E. 45th Avenue and S.E. Belmont Street in Portland, a cab driver was waiting. The driver previously had been a police officer in Costa Rica. He now drove a taxi cab in Portland. On the day of the bank robbery, the taxi cab driver began work at 7:00 a.m. It was a slow morning. The previous passenger left the taxi cab at 11:20 a.m.

At 12:20 p.m., the dispatcher contacted the taxi driver with instructions to pick up a man at 12:30 p.m. at 4506 S.E. Belmont. The taxi driver was told to wait at the cab and not to knock on any doors. The driver was told to wait for a passenger named "Kirk." The taxi driver arrived at 4506 S.E. Belmont about three minutes before 12:30 p.m. He waited for several minutes, but no one came out. The driver called the telephone number on his screen, but no one answered. Just then, a person "walking quickly" approached from the south, from S.E. 45th Avenue. The approaching man yelled to the taxi driver, "that's my cab." The taxi driver respond by asking, "are you Kirk?" The man said "yes." The taxi driver opened the door for the man, who got into the back seat of the taxi cab. That man was the Defendant, Wes Edward Hamman.

The taxi driver drove away with Hamman in the back seat. Within a few blocks, the taxi driver noticed a Portland Police car directly behind him. Within moments, several other Portland Police cars surrounded the taxi, ordered the driver to stop, and ordered Hamman to get out of the taxi. Hamman complied. In the back seat of the taxi cab, where Hamman had been sitting, the police found the Key Bank electronic tracking device (which is how the police so quickly found the taxi), the five pre-recorded bait bills, almost two thousand dollars in cash (mostly in hundreds

and fifties), and the actual note that was used in the robbery of Key Bank minutes earlier. The note read: "Gun!! Give me all the $ NOW!!"

The police transported the teller to the location of the taxi cab. After the teller identified Hamman as the robber, in part by a tattoo on the robber's arm that the teller had seen, Hamman was arrested. He was not, however, wearing the same clothes that the bank robber had worn, and there was no sign of the baseball cap with the Batman logo, the surgical mask, or the sunglasses that had been worn by the robber.

A few days later, Portland Police detectives located the shirt apparently worn by the robber, along with sunglasses, a baseball cap with a Batman logo, and a surgical mask in the bushes in a residential neighborhood between the Key Bank and the location were the taxi driver picked up Hamman (who identified himself as "Kirk" to the driver). Law enforcement kept these items separate from the clothes worn by Hamman at the time of his arrest. Law enforcement also tested the items found in the bushes for DNA. Hamman's DNA was found on both the inside rim of the baseball cap with the Batman logo and on the inside of the surgical mask. At the conclusion of the trial, the jury returned a verdict, finding Hamman guilty of bank robbery.

## C. Post-trial

The jury returned its verdict on January 24, 2017. ECF 98. More than one month later, on March 1, 2017, Hamman, through his standby counsel Mr. Warren, moved to allow Mr. Warren to represent Hamman at sentencing. ECF 103. The Court granted that motion two days later. ECF 105. On March 28, 2017, however, Mr. Warren filed a motion to withdraw as counsel. ECF 106. In a separate declaration, filed *ex parte*, Mr. Warren explained the reasons for his motion. ECF 107. The Court granted the motion the same day and appointed Per C. Olson as substitute counsel. ECF 108. On May 15, 2017, more than three months after the jury's verdict,

Hamman, through his newly appointed substitute counsel, Mr. Olson, filed the pending motion for new trial. ECF 116.

## DISCUSSION

In his motion for new trial, Hamman's primary argument is that the Court denied him his Sixth Amendment right to counsel. In addition, Hamman presents several alternative grounds that he argues also warrant a new trial under the "totality of the circumstances."

### A. Timeliness

The Government objects that Hamman's motion for new trial is untimely. Because Hamman did not base his motion on "newly discovered evidence," to be timely his motion must have been "filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1)-(2). The jury rendered its verdict on January 24, 2017, and Hamman filed his motion for new trial on May 15, 2017. Thus, Hamman's motion is untimely.

Hamman argues, however, that his failure timely to file his motion for new trial was due to "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). In support of this argument, Hamman states that his failure timely to file was the result of him proceeding *pro se*, relying on standby counsel for important case deadlines, being unable to communicate with standby counsel for two weeks after the trial, and not receiving from standby counsel a list of potential post-trial motions that he could file. Hamman's reasons are insufficient to show excusable neglect.

During the *Faretta* hearing, the Court explained to Hamman that "the rules and procedures of a trial—that includes the Federal Rules of Evidence and the Federal Rules of Criminal Procedure—they will still apply to you, even though you're not a lawyer." ECF 112 at 15:9-12. The Court also advised Hamman that "a trained lawyer would and will defend you far better than you can defend yourself, and I think it is unwise of you to try to represent yourself. . . . I strongly urge you and recommend that you not try to represent yourself." ECF 112

at 21:10-17. Thus, Hamman was advised that he would be expected to follow the Federal Rules of Criminal Procedure, and Hamman asked to represent himself despite the Court's warning that to do so would be "unwise." *Cf. Faretta*, 422 U.S. at 834 n.46 (stating that the right of self-representation is not "a license not to comply with relevant rules of procedural and substantive law" and that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel'").

Hamman also argues that excusable neglect is present in this case based on the four factors approved by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 385, 389 (1993) (addressing excusable neglect in the context of a bankruptcy proceeding). These four factors are: (1) whether allowing the late motion to be considered will prejudice the opposing party; (2) the length of the delay and its effect on efficient court administration; (3) whether the delay was beyond the reasonable control of the person whose duty it was to perform; and (4) whether the movant acted in good faith. The Government concedes that it suffers no prejudice by having to respond to Hamman's motion for new trial now as opposed to three months ago. In addition, there is no assertion that Hamman acted in other than good faith with respect to the timing of his motion. Regarding the length of the delay, the Court observes that Hamman did not barely miss the filing deadline; instead, his filing is more than three months late. Finally, the delay was not beyond Hamman's reasonable control. During the *Faretta* hearing, Hamman was expressly told by the Court that the Federal Rules of Criminal Procedure "will still apply to you, even though you're not a lawyer." ECF 112 at 15:11-12; *see also* ECF 112 at 21:13-17 ("[Y]ou're not familiar with the rules of evidence and the rules of criminal procedure. So I strongly urge you and recommend that you not try to represent yourself."). In light of Hamman's lengthy delay in filing and his choice to represent

himself, Hamman's failure timely to file was not the result of excusable neglect. The Court, nevertheless, will address the merits of Hamman's motion.

## B.  Sixth Amendment Right to Counsel

Hamman argues that the Court denied him his Sixth Amendment right to counsel when, in granting Hamman's motion for his first substitute court-appointed counsel, the Court told Hamman that he almost certainly would not be given a third court-appointed attorney. Hamman, however, never asked for a third court-appointed counsel.[2] He explains in this motion and supporting declaration that his failure even to ask for a third court-appointed attorney before trial was because he believed, based on the Court's comments, that such a request would be futile.

As discussed above, during the hearing held on November 2, 2016, on Hamman's first motion for appointment of substitute counsel, the Court told Hamman outside the presence of the Government that the Court was "not going to [appoint counsel] a third time. I'm not going to do it again after this." ECF 125 at 11:21-25. The Court also told Hamman that he would "either have to stay with that second attorney or . . . tell [the Court] that [he] want[s] to represent [himself]," ECF 125 at 12:11-12, and that the Court "want[ed] to make sure [Hamman] underst[ood he was] not going to get a third [attorney]." ECF 125 at 14:11-16. Nevertheless, the Court also told Hamman that it was not impossible that the Court would appoint a third counsel: "[I]f you tell me you want a third attorney, I'm *almost certainly* going to say no. I will give you

---

[2] Hamman refers the Court to *United States v. Robinson*, 913 F.2d 712, 718 (9th Cir. 1990) (holding that a defendant who requests an attorney for sentencing purposes is entitled to have one appointed, even though the defendant previously waived his right to counsel and represented himself at trial). This case is inapplicable to the pending motion because Hamman did not request a third court-appointed attorney until after trial, at which time one was appointed to represent him. Had either Hamman or Mr. Warren told the Court that there may be grounds for appointment of a new (*i.e.*, third) attorney, the Court would have spoken with Hamman outside the presence of the Government to inquire about the basis or grounds of any such request. But no such request was made.

have [*sic*] two shots, and takes [*sic*] [that's] it." ECF 125 at 12:1-22 (emphasis added). In addition, after the Government returned to the courtroom, the Court reiterated that it "*generally* do[es] not grant a third [*sic*] request for a third attorney" and that it "*almost certainly* will not appoint a third attorney." ECF 125 at 24:24-25:7 (emphasis added). The Court did not tell Hamman that he could not ask for a third court-appointed attorney or could not explain why he needed one. The Court simply informed Hamman what would be the likely result.

Hamman relies on *United States v. Velazquez*, in which a district court denied a defendant's motion for substitute counsel without making any inquiry into the reasons for the motion, despite the fact that the defendant "clearly and consistently raised concerns about her representation," including at her arraignment and rescheduled arraignment, filed two *pro se* motions to replace her attorney, and "tried to present supporting evidence and to argue the motion in court." 855 F.3d 1021, 1026, 1035 (9th Cir. 2017). In *Velazquez*, the Ninth Circuit explained how a court should evaluate a defendant's motion for substitute counsel. That case, however, is inapplicable here because Hamman never asked, or moved, for a third court-appointed attorney before trial.

In his motion for new trial, Hamman argues that he only asked to represent himself because he thought that it would be futile to ask for a third court-appointed attorney.[3] The record, however, belies this argument. During the *Faretta* hearing on Hamman's motion to represent himself, which occurred approximately one-month before trial, Hamman gave no indication that he wanted a third court-appointed counsel. Nor did Hamman raise any concerns with

---

[3] Hamman also argues that he "had a difficult time representing himself, and if the choice had been presented to him, he would have sought to obtain another court-appointed attorney over self-representation." ECF 117 at 11. The Court specifically warned Hamman that it would be "unwise" to represent himself, but Hamman knowingly and voluntarily chose to do so at trial, and he clearly explained to the Court his tactical or strategic reason for wanting to represent himself at trial.

Mr. Warren's performance or their relationship. Instead, Hamman stated only that he wanted to represent himself in order to "tell [his] side" of the story without "tak[ing] the stand" and causing his "past . . . [to] come up." ECF 112 at 28:24-29:1. At trial, this is the strategy that Hamman pursued. Hamman did not testify at trial, and the jury never learned about his prior felony convictions (or his alleged escape attempts). During his opening statement and closing argument, Hamman repeatedly sought to present his "side" of the story, even though the trial record contained no evidence of many of the points that Hamman argued in closing. *See, e.g.*, ECF 132 at 42:9-21, 43:16-44:7, 47:16-20-49:22. If Hamman had obtained a third court-appointed counsel to represent him at trial, Hamman would have been unable to tell the jury his "side" without taking the stand, answering questions on cross-examination, and risking that the jury would be informed about his prior criminal record.

Moreover, during each of the three pretrial conferences held during the 30 days immediately preceding trial, Hamman never raised any concerns about Mr. Warren's performance or their attorney-client relationship or expressed any desire for the Court to appoint a different (*i.e.*, third) attorney to represent Hamman.[4] Hamman represented himself at trial for tactical or strategic reasons and not because he was under the belief that he would not be provided with court-appointed counsel if he presented a good reason to the Court. Moreover, on several occasions Hamman would repeat the same motion to dismiss invoking his speedy trial rights, notwithstanding the fact that the Court each time properly denied that motion. Hamman, thus, had no difficulty expressing himself when he chose to do so or make arguments even in the

---

[4] In his declaration filed with his reply, Hamman states that "[a]fter a while I started getting scarred [*sic*] about preparing for trial, so I asked [Mr. Warren] to be my lawyer again. He turned me down by saying 'you got this.'" ECF 135 ¶ 2. First, the Court need not consider new evidence filed with a reply. Second, even if the Court considered this evidence, it would not warrant a new trial because, before trial, Hamman never asked the Court to reappoint Mr. Warren or to appoint anyone else as trial counsel.

face of likely futility. If Hamman wanted to ask for a new court-appointed attorney before trial, he would have done so, notwithstanding the Court's prior statements that the Court almost certainly would have denied such a motion. Hamman never gave the Court the opportunity to hear whether Hamman had good cause to receive a third court-appointed attorney.[5]

On the morning of the first day of trial, Hamman raised a concern with the Court about Mr. Warren (then, his standby counsel) and Mr. Warren's investigator not doing all that Hamman wanted them to do. The Court evaluated Hamman's list of requests and concluded that this did not warrant a further continuance of the trial date because the list contained nothing "that could not have been raised in a more timely fashion." ECF 128 at 8:11-12.

Hamman never told the Court that he had a conflict or any significant differences with Mr. Warren, let alone an irreconcilable conflict. Hamman only expressed frustration on the morning of trial that Mr. Warren, who at that time was serving only as court-appointed standby counsel, had not completed all of the tasks that Hamman had wanted to be done. Hamman argues now that he did not want to say anything critical of Mr. Warren while standing next to Mr. Warren in the courtroom. The Court, however, finds this less than credible because Hamman showed no difficulty in telling the Court why he did not want his first court-appointed attorney,

---

[5] The Court also observes that at the oral argument on the pending motion for new trial, held on July 11, 2017 (ECF 116), after the Court orally announced its ruling denying the motion, explained its reasons, and indicated its intention also to file a written opinion, Hamman personally asked if he could be heard. The Court granted Hamman's request. Hamman then respectfully explained why he disagreed with the Court's ruling. Although the Court was not persuaded, this is further evidence that Hamman could have—and would have—requested the appointment of a new (third) attorney to represent him at trial if he was dissatisfied with the services of Mr. Warren. Moreover, this is further support for the conclusion that Hamman's decision to represent himself at trial was for the tactical or strategic reason of getting his "side" of the story before the jury without having to answer questions on cross-examination or risk disclosure of his "past."

Ms. Freccero, while he stood next to her in the courtroom. ECF 125 at 4:5-7:18. Hamman's evidence and argument under the Sixth Amendment are insufficient to warrant a new trial.

## C. Other Grounds Asserted by Hamman

Hamman also argues that other grounds, when considered in total, support his motion for new trial. These grounds consist of: (1) the Court's comment in the presence of the jury that Hamman says improperly refers to his custodial status; (2) the Court's denial of Hamman's motion for a continuance made on the first day of trial so that Hamman might be able to obtain the services of retained counsel; (3) the Court's failure to hold a hearing outside the presence of the jury on the admissibility of the Government's DNA evidence; (4) discovery violations supposedly committed by the Government; (5) the inability of the Government to locate the clothes that Hamman was wearing at the time that he was arrested; and (6) Hamman's contention that the Government altered certain video evidence shown to the jury.

### 1. Hamman's Custodial Status

Hamman argues that a comment made by the Court while the jury was in the courtroom improperly and prejudicially referred to Hamman's custodial status, which warrants a new trial. *See United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995) ("A jury's view of a defendant while he or she is handcuffed implicates the defendant's Fifth Amendment right to due process.").

At one point during the trial, the Court was preparing to hear, during a break, a brief criminal matter involving a different defendant who also was in custody. Immediately after the break began, the Court instructed jurors to leave the courtroom for their recess and appropriately instructed the jury. The Court, however, inadvertently stated to a U.S. Deputy Marshal in the courtroom, while some of the jurors were leaving the courtroom: "Let me ask the marshals, if you would escort Mr.—not yet. Everybody stay seated [spoken to the Defendant, his standby

counsel, and the Government].” ECF 131 at 159:18-19. After the last juror left the courtroom,

Hamman stated to the Court, “That was [a] close all,” and the Court responded, “Yes. I know. I

apologize.” ECF 131 at 159:22-23. During the recess, while the jurors were in the jury room, the

following discussion then occurred:

> MR. HAMMAN: Also, do I tell you that I think that I should call for a mistrial?

> THE COURT: If you want to move for a mistrial, you certainly may, but briefly tell me why.

> MR. HAMMAN: Because the jury, I think, heard what you said. Even though I don’t think you mentioned my name, but you said, “U.S. marshals, please escort”—and there were still jurors there.

> THE COURT: Fair enough. Your motion for mistrial is denied. I don’t believe I said anything that would be prejudicial to the jurors. However, I will ask you now, is there any curative statement that you would like me to make? I will be glad to tell the jurors virtually anything that is appropriate that you want me to tell them.

> MR. HAMMAN: I don’t know what would be appropriate.

> THE COURT: I don’t think there is anything prejudicial that was said. But if you want me to make a curative statement, I will certainly consider it.

> MR. HAMMAN: I just don’t know what to say.

> THE COURT: Mr. Kerin, the Government’s position.

> MR. KERIN: Your Honor, I don’t know if we need a curative instruction. What I would suggest, though, if it does cause an issue, I think the Court could simply say at some point, “Hey, jurors, you might have noticed that there is security in the courtroom. That is a standard practice we do in court, and you shouldn’t assume anything by it.” Now the danger is that draws more attention to it, if they are not really paying attention. That would be up to Mr. Hamman whether he really wants that instruction.

> THE COURT: I think I will also tell them that I’m trying to handle a number of matters at the same time. Immediately after we just took our break, I was asking the marshals to bring in someone— well, I don’t know if I want to get into that—but I was bringing in someone who was in custody.

MR. HAMMAN: Your Honor.

THE COURT: Yes, Mr. Hamman.

MR. HAMMAN: I think I heard it right. What I heard was, "Can you please escort," and I don't think you said the name.

THE COURT: No.

MR. HAMMAN: I am the only one in here, and there were still jurors leaving.

THE COURT: I know. But I wanted them to escort you out and escort someone else in.

MR. HAMMAN: Right. It was an accident. I'm not saying that it wasn't.

THE COURT: Fair enough. I think I'll say what Mr. Kerin suggested and nothing more.

MR. HAMMAN: I don't know if that is a good idea.

THE COURT: If you ask me not to say it, then I won't.

MR. HAMMAN: Well, if you say it, it is just going to—you can't ask them, "Hey, did anybody hear anything?" You can't ask them that.

THE COURT: No. But I'm offering you this option, and you may tell me what you prefer. Either I will ignore the issue completely, and we will move on, or I'll tell the jury, "Members of the jury, you may have noticed that there is security in the courtroom, and that's generally what federal courthouses look like these days."

MR. HAMMAN: Maybe you could just say—

THE COURT: Pardon me?

MR. HAMMAN: Whatever you think is right.

THE COURT: All right. I'll say that.

ECF 131 at 166:1-168:15. After this discussion, the jury was brought back into the courtroom.

The Court then gave the following curative instruction:

> Before we proceed, let me just tell you all something that is part of my legal instruction to you, and that is from time to time you may

> notice that we have security in our federal courtroom. That is just
> life in a United States federal courthouse these days. It should in
> any [*sic*] [no] way affect your decision. It has absolutely nothing to
> do with the guilt or innocence of any particular defendant, and that
> includes Mr. Hamman or anybody else.
>
> So please, now that I've mentioned it, disregard the fact that you
> may from time to time see security.

ECF 131 at 168:20-169:4.

The Court's comment to the jury does not warrant a new trial. The Court did not mention

Hamman by name, stating only: "Let me ask the marshals, if you would escort Mr.—not yet."

ECF 131 at 159:18-19. The Court was preparing to hear, during the break, a different matter

involving a different criminal defendant. The jury did not see any indicia of Hamman's custodial

status, Hamman acknowledged that the Court's comment was an accident, ECF 131 at 167:21-

22, and Hamman has not shown any actual prejudice. *See United States v. Halliburton*, 870

F.2d 557, 560-61 (9th Cir. 1989) (noting that "a jury's brief, inadvertent observation of a

defendant in custody does not compel reversal in the absence of an affirmative showing of actual

prejudice"). Moreover, after making the inadvertent comment, the Court crafted a curative

instruction with input from both parties. Hamman agreed that the Court should give whatever

instruction "you think is right," ECF 131 at 168:14, and the Court gave that instruction. Because

Hamman has shown no actual prejudice, the Court's comment does not warrant a new trial.

### 2. Denial of a Trial Continuance

On the morning of the first day of trial, Hamman asked for a continuance on the ground

that his son "was *trying* to get [Hamman] a lawyer."[6] ECF 128 at 4:4 (emphasis added). Nothing

specific, however, was presented to the Court about when a lawyer would be available or

---

[6] The Court granted the second continuance after granting Hamman's motion for a
second court-appointed attorney in order to give the defense adequate time to prepare. ECF 47.

whether a lawyer had even agreed to represent Hamman if there were a continuance. The Court responded that Hamman had "said nothing about wanting more time to retain a private attorney or otherwise" at either the *Faretta* hearing held in December or at any of the three pretrial conferences held during the month before trial began, including "yesterday when we spoke." ECF 128 at 8:12-15. The Court concluded that Hamman's untimely request for a continuance was merely a delaying tactic. The Court's ruling does not warrant a new trial.

### 3. Hearing out of the Presence of the Jury on the Admissibility of DNA Evidence

Hamman argues that a new trial is warranted based on the Court's failure to hold a hearing outside the presence of the jury on the admissibility of the Government's evidence of Hamman's DNA found on the baseball cap with the Batman logo and the surgical mark found in the bushes not too far from the bank. Before trial, Hamman objected to the Government's DNA evidence, arguing that there may have been cross-contamination of the relevant items. The Government responded by representing that it would call sufficient chain-of-custody and foundation witnesses before asking expert witnesses to testify about the results of the DNA testing. The Court allowed that procedure and told Hamman that if wanted to raise this issue again at trial after he heard from the Government's chain-of-custody and foundation witnesses, Hamman would be afforded that opportunity. At trial, the Government presented its chain-of-custody and foundation witnesses, and Hamman cross-examined them. Afterward, Hamman did not ask to be heard outside the presence of the jury on this issue. The Court then allowed the Government to call its DNA testing experts and to inquire about the results of their testing. Hamman raised no objection at that time and did not request to be heard further.

The Court was not required to hold a further hearing outside the presence of the jury because the DNA evidence met the applicable standards for admissibility, and Hamman did not request any further hearing concerning the admissibility of the Government's DNA evidence

after the Government's chain-of-custody and foundation witnesses gave their testimony and Hamman cross-examined them. *See* Fed. R. Evid. 104; *see also United States v. Wright*, 215 F.3d 1020, 1027 (9th Cir. 2000); *United States v. Alatorre*, 222 F.3d 1098, 1103-04 (9th Cir. 2000) (holding that a district court could allow a defendant to "explore [a witness's] qualifications and the basis for his testimony at trial," rather than hold a *Daubert* hearing).

In addition, at trial, the Government presented foundational evidence of chain of custody "'with sufficient completeness to render it improbable that the [clothing] was either . . . exchanged with [other items of clothing] or . . . contaminated or tampered with.'" *United States v. Johnson*, 977 F.2d 1360, 1067 (10th Cir. 1992) (emphasis omitted) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989)). The Court was satisfied with the foundation evidence presented by the Government at trial. If Hamman were not satisfied with this foundation, he could have timely objected or asked for a further hearing outside the presence of the jury. Hamman made no such request. Thus, the lack of an evidentiary hearing does not warrant a new trial.

### 4. Hamman's Claim of Discovery Violations by the Government

Hamman argues that counsel for the Government committed discovery violations that justify a new trial. Hamman asserts that counsel for the Government did not give him a stack of discovery materials relating to DNA testing until the day before the DNA witnesses were to testify, even though Hamman's DNA expert had received such discovery before trial. Because the Government provided this discovery to Hamman's counsel and expert witnesses well before trial, there was no discovery violation and no prejudice to Hamman.

In addition, on the day before trial, counsel for the Government gave Hamman 18 color photographs depicting the clothes found near the bank. The Government should have provided these photographs earlier to Hamman, but the Court finds that a sanction is not warranted.

Rule 16(d)(2) of the Federal Rules of Criminal Procedure grants the Court discretion to sanction parties for discovery violations. A court should not impose a sanction, however, that is "disproportionate to the conduct of counsel." *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987). Further, the Court should consider the following factors when determining an appropriate sanction, if any:

> the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance.

*United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988). There was no bad faith on the part of the Government when trial counsel gave copies of the photographs to Hamman promptly after the Portland Police Bureau provided them to the Government's counsel. ECF 122 at 20. Moreover, the late disclosure did not cause Hamman any prejudice. The photographs depicted the clothing (including the robber's shirt, baseball cap with the Batman logo, surgical mask, and sunglasses) that the Government already had disclosed to Hamman. In addition, Hamman had also police reports discussing the location where the clothing was found and mentioning that Portland Police officers had taken photographs.[7] Thus, the fact that the Government provided copies of these photographs to Hamman when it did does not warrant a new trial.

### 5. Clothing Worn by Hamman at the Time of His Arrest

Hamman argues that the Government was unable to locate the clothing that Hamman was wearing at the time Portland Police officers arrested him and that this failure warrants a new

---

[7] In addition, Hamman admits to seeing two of these photographs beforehand, but asserts that they were "small, grainy, [and] black and white." ECF 117 at 14.

trial.[8] This clothing was not the clothing that was found near the bank that resembled the clothing worn by the robber as depicted in the bank's surveillance video. The Government adds that FBI Special Agent June Piniewski searched for the clothing that Hamman was wearing at the time of his arrest and learned that the clothing likely was "donated to someone or disposed of" because Hamman did not ask the Bureau of Prisons to send his clothing to anyone. ECF 129 at 4:1-23. There is no evidence that the Government conducted this search in bad faith.

The Court told Hamman that because Special Agent Piniewski could not locate Hamman's clothing from the day of his arrest, Hamman could ask her at trial what happened to his clothing and could argue to the jury any reasonable inferences. Outside the presence of the jury, counsel for the Government asked Hamman, "do you want Special Agent Piniewski to go into the area of what she learned about what happened to your clothing?" ECF 130 at 114:13-15. Hamman responded that he did not want Special Agent Piniewski to testify about this issue, ECF 130 at 16-17, and she did not. Thus, Hamman has not shown any prejudice.

Hamman also disputes the Government's explanation for what happened to his clothing. Hamman asserts that before the end of trial, he was told that his shoes had been located in the property room at the Multnomah County Justice Center, where he was being held in custody. ECF 117 at 15. Hamman, however, offered no admissible evidence to that effect. After trial, Hamman states that his current counsel was able to obtain the clothing stored in Hamman's prisoner property at the Multnomah County Justice Center. Hamman, however, admits that this "appears to be temporary jail clothes," not the clothing that he was wearing at the time of his arrest. ECF 134 at 7. Thus, the Government's inability to locate and produce the clothing that Hamman wore at the time of his arrest does not warrant a new trial.

---

[8] At oral argument, Hamman acknowledged that he is not asserting any misconduct by the Government in connection with this issue.

### 6. Alleged Alteration of Video Evidence

Hamman argues that a new trial is warranted based on his assertion that someone must have altered the video images taken of him inside the taxi cab that he was riding in just before his arrest. Hamman requests an evidentiary hearing on this matter. Hamman, however, offers no evidence to support his assertion that these images have been altered in any way. The Court denies Hamman's request, and Hamman's unsupported allegation does not warrant a new trial.

### CONCLUSION

Defendant's Motion for New Trial (ECF 116) is DENIED.

**IT IS SO ORDERED**.

DATED this 12th day of July, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge