IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **WES EDWARD HAMMAN**, <br><br> Defendant. | Case No. 3:16-cr-185-SI <br><br> **OPINION AND ORDER** |

**Michael H. Simon, District Judge.**

On April 3, 2020, Defendant Wes Edward Hamman ("Mr. Hamman"), through his physician and friend, petitioned the warden of the United States Penitentiary at Tucson, Arizona ("USP Tucson") for compassionate release. On May 15, 2020, Mr. Hamman, through counsel, timely filed in this Court the pending Motion for Compassionate Release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 188. The Government opposes Mr. Hamman's motion at this time, with leave to seek reconsideration if the conditions at USP Tucson change. For the reasons that follow, the Court DENIES Mr. Hamman's motion for release with leave to seek reconsideration if future circumstances warrant.

## LEGAL FRAMEWORK FOR COMPASSIONATE RELEASE

### A.  Modifying a Term of Imprisonment for Compassionate Release

A district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824-25 (2010). Congress, however, has expressly authorized a district court to modify a defendant's sentence in three limited circumstances: (1) when granting a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A); (2) when expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; or (3) when a defendant has been sentenced based on a sentencing range that has subsequently been lowered by the Sentencing Commission. 18 U.S.C. § 3582(c)(1). The motion before the Court seeks compassionate release.

Before 2018, § 3582(c)(1)(A) required that a motion for compassionate release could be brought only by the Bureau of Prisons ("BOP"). The First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), amended § 3582 to authorize courts to grant a motion for compassionate release filed by a defendant. A defendant, however, may only bring a motion for compassionate release *after*: (1) petitioning the BOP to make such a motion on the defendant's behalf; *and* (2) either (a) the defendant has exhausted all administrative appeals after the BOP denied the defendant's petition or (b) thirty days has elapsed after the warden of the defendant's facility received the defendant's petition, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).[1]

---

[1] On June 2, 2020, the United States Court of Appeals for the Sixth Circuit held that a defendant's failure to satisfy this administrative exhaustion requirement does not deprive a court of subject-matter jurisdiction; instead, this is a mandatory claim-processing rule that binds the courts when properly asserted by the Government and not forfeited. *United States v. Alam*, --- F.3d ---, 2020 WL 2845694 (6th Cir. June 2, 2020). The Ninth Circuit has not yet addressed this issue.

Compassionate release under § 3582(c)(1)(A) authorizes a court to modify a defendant's term of imprisonment if the court finds that two conditions have been satisfied. The first is that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). The second is that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The court also must *consider* the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable. *Id.*

## B. Extraordinary and Compelling Reasons

The Sentencing Commission policy statement for reducing a term of imprisonment under § 3582(c)(1)(A) is found in the United States Sentencing Guidelines Manual ("USSG") at § 1B1.13. That policy statement explains the phrase "extraordinary and compelling reasons." USSG § 1B1.13(1)(A) and cmt. 1. According to the policy statement, extraordinary and compelling reasons are: (1) the medical condition of the defendant (defined as whether the defendant is suffering from a terminal illness; or is suffering from a serious physical or medical condition, serious functional or cognitive impairment, or deteriorating physical or mental health because of the aging process, "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"); (2) the age of the defendant (defined as whether the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less); (3) family circumstances (defined as the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner); and (4) any other extraordinary and compelling reason determined by the Director of the BOP. USSG § 1B1.13 cmt. 1.

We are currently in a global health crisis caused by the 2019 novel Coronavirus ("COVID-19"), which already has taken the lives of more than 105,000 people just in the United States during the past several months. When a defendant has a chronic medical condition that may substantially elevate the defendant's risk of becoming seriously ill or dying from COVID-19, that condition may satisfy the standard of extraordinary and compelling reasons. Under these circumstances, a chronic medical condition (*i.e.*, one from which a defendant is not expected to recover) reasonably may be found to be both serious and capable of substantially diminishing the ability of the defendant to provide self-care within the environment of a correctional facility, even if that condition would not have constituted an extraordinary and compelling reason absent the heightened risk of COVID-19. *See generally* USSG § 1B1.13 and cmt. 1(A)(ii)(I).

Alternatively, USSG § 1B1.13, as currently written, does not constrain the Court's ability to find extraordinary and compelling reasons here. Because the Sentencing Commission's policy statement was not amended after enactment of the First Step Act, "a growing number of district courts have concluded the Commission lacks an applicable policy statement regarding when a judge can grant compassionate release" . . . "because the Commission never harmonized its policy statement with the FSA." *United States v. Mondaca*, 2020 WL 1029024, at *3 (S.D. Cal. Mar. 3, 2020) (citing *Brown v. United States*, 411 F. Supp. 3d 447, 499 (canvassing district court decisions)) (quotation marked omitted); *see also United States v. Redd*, 2020 WL 1248493, at *6. (E.D. Va. Mar. 16, 2020) ("[T]here does not currently exist, for the purposes of satisfying the ["FSA's] 'consistency' requirement, an 'applicable policy statement.'"); *United States v. Barber*, 2020 WL 2404679, at *3 (D. Or. May 12, 2020) ("The Court is persuaded by the reasoning of numerous other district courts and holds that it is not constrained by the BOP Director's

determination of what constitutes extraordinary and compelling reasons for a sentence reduction.") (citations and quotation marks omitted).

As explained by one court, "a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and [28 U.S.C.] § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." *United States v. Perez*, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020). Indeed, the Government previously conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed many other district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id*. The Court agrees with this alternative analysis as well.

## C.  Safety of Other Persons and the Community

The policy statement further provides that, in addition to finding extraordinary and compelling reasons, a court also must find that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13(2). The factors to be considered in deciding whether a defendant is a danger to the safety of any other person or to the community are: (1) the nature and circumstances of the offense (including whether the offense is a crime of violence, a violation of 18 U.S.C. § 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device); (2) the weight of the evidence; (3) the history and characteristics of the defendant

(including, among other things, the defendant's character, physical and mental condition, and family ties and whether at the time of the offense or arrest the defendant was on probation, parole, or other release); and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

**D.  Sentencing Factors Under § 3553(a)**

Finally, as provided in both § 3582(c)(1)(A) and the policy statement, a court must consider the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable. These factors include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training, medical care, or other treatment in the most effective manner. 18 U.S.C. § 3553(a). The policy statement also recognizes that the sentencing court "is in a unique position to determine whether the circumstances warrant a reduction . . ., after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement[.]" USSG § 1B1.13 cmt. 4.

## DISCUSSION

On April 20, 2016, Mr. Hamman robbed a branch of Key Bank in Portland, Oregon by force and violence or by intimidation, in violation of 18 U.S.C. § 2113(a). After entering the bank, Mr. Hamman approached a bank teller, said "I have a gun," and presented a demand note reading: "Gun!! Give me all the $ Now!!." He left the bank with approximately $2,210 of the bank's currency, including bait bills and a hidden GPS transmitter. Within the hour, law enforcement officers found Mr. Hamman in the back of a taxicab along with $2,232, including the bait bills, and the demand note. The taxi driver confirmed that Mr. Hamman, using a false name, entered the taxi at a time shortly after the bank robbery occurred. Mr. Hamman was taken

into custody. His DNA was later found on a surgical mask and baseball cap worn by the bank robber and discarded in the bushes a few blocks from the bank.

On January 24, 2017, a jury convicted Mr. Hamman after a five-day trial. On September 5, 2017, the Court sentenced Mr. Hamman to a term of imprisonment of 115 months, followed by three years of supervised release. Mr. Hamman is currently incarcerated at USP Tucson. He is scheduled for release on July 15, 2024.[2] He has already served approximately 50 percent of his anticipated sentence.

At the time of this offense, Mr. Hamman was 45 years old, and his history of criminal convictions is lengthy. At age 21, Mr. Hamman committed theft; at age 24, he possessed a dangerous weapon; at age 26, he possessed Mr. Hamman has a serious medical condition. Mr. Hamman suffers from hypertrophic obstructive cardiomyopathy. While he was awaiting sentencing in this matter, doctors placed a defibrillator in Mr. Hamman's chest. Since he has been in prison, Mr. Hamman also has been diagnosed with hyperthyroidism, essential hypertension, cardiac arrhythmia, and has experienced acute embolism and thrombosis of the vein in his shoulder. He has been hospitalized several times during the past three years when he has experienced prolonged chest pain, shortness of breath, loss of consciousness, dizziness, and ventricular tachycardia (fast heartbeat). He has been on several courses of medication for his heart condition and is currently taking Amiodarone for cardiac arrhythmia. Mr. Hamman's cardiomyopathy heart disease is not curable. The warden at USP Tucson denied compassionate release partly on the ground that Mr. Hamman's medical diagnoses "are currently well controlled and will continue to be managed and monitored."

---

[2] Based upon programming that Mr. Hamman has successfully completed while in custody, he may be eligible for additional time credits under the First Step Act and thus may be released even sooner than July 2024.

PAGE 7 – OPINION AND ORDER

We are in a global pandemic and health crisis. The CDC warns that "[p]eople 65 years and older" are "at high-risk for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (lasted visited June 4, 2020). In addition, the CDC explains that people of all ages with certain underlying medical conditions, particularly if not well controlled, are also at high-risk for severe illness from COVID-19. According to the CDC, these underlying medical conditions are:

- People with chronic lung disease or moderate to severe asthma[.]
- *People who have serious heart conditions*[.]
- People who are immunocompromised[.]
  \* \* \*
- People with severe obesity (body mass index [BMI] of 40 or higher)[.]
- People with diabetes[.]
- People with chronic kidney disease undergoing dialysis[.]
- People with liver disease[.]

*Id*. (emphasis added).

As noted, Mr. Hamman is 49 years old. He has a serious heart condition that places him within the CDC's classification of persons at high-risk for severe illness from COVID-19. In his motion for compassionate release, Mr. Hamman proposes a release plan that would place him on home confinement for a period lasting up to his projected release date of July 15, 2024. Mr. Hamman proposes to live with his parents at their home in Highland, Utah, which is on the outskirts of Salt Lake City. Mr. Hamman reports that his parents are in their 70s and in "poor health." Mr. Hamman also proposes to be on electronic monitoring under the supervision of the U.S. Probation Office in Salt Lake City and states that he would not leave his parents' home except for necessary medical appointments. The U.S Probation Office for the District of Utah in Salt Lake City has spoken with Mr. Hamman's father, who reports that he has firearms and ammunition in his home but would remove them and store them at his daughter's residence. The

PAGE 8 – OPINION AND ORDER

Probation Office for the District of Utah has agreed to supervise Mr. Hamman, if compassionate release is ordered by the Court.

The Government does not dispute that Mr. Hamman has a serious medical condition that renders him more susceptible to dangerous complications if he were to contract the COVID-19 virus. But the Government states that USP Tucson currently has no confirmed cases of that virus. The Government adds that if that situation were to change, Mr. Hamman's motion could be reconsidered. As of June 7, 2020, the BOP has reported that one staff person at that facility has recovered from COVID-19 and that there are no confirmed cases of COVID-19 among any inmates at USP Tucson. *See* https://www.bop.gov/coronavirus/ (last visited June 8, 2020).[3]

The Government opposes Mr. Hamman's motion on several ground. First, the Government argues that Mr. Hamman has failed to establish that he has an extraordinary or compelling reasoning that warrants early release. The Government states that Mr. Hamman has failed to demonstrate that merely living in a federal institution that could, at some point in the future, see positive cases of COVID-19 is enough to meet the statutory standard. Second, the Government argues that Mr. Hamman has failed to establish that he is no longer a danger to the community. At age 49, Mr. Hamman is not elderly, and when he robbed the Key Bank in 2016 at

---

[3] The BOP's information, however, is of limited value. The BOP does not disclose whether or to what extent this facility is testing symptomatic or asymptomatic inmates, both or neither. In *United States v. Pabon*, 2020 WL 2112265, at *5 (E.D. Pa. May 4, 2020), the court cited Johns Hopkins Bloomberg School of Public Health Professor Leonard Rubenstein to explain the link between testing and limiting the spread of COVID-19: "Unless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on . . . It's too late." *Id.* (citing Kevin Johnson, Mass Virus Testing in State Prisons Reveals Hidden Asymptomatic Infections; Feds Join Effort, USA TODAY (Apr. 25, 2020, updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-revealshidden-asymptomatic-infections/3003307001/) (last visited June 2, 2020); *see also Arias v. Decker*, 2020 WL 2306565, at *8 (S.D.N.Y. May 8, 2020) ("[W]hen it comes to vulnerable detainees . . ., monitoring them for signs of infection is too little, too late.").

the age of 45, he had the same heart condition that he now has. The Government adds that Mr. Hamman has never acknowledged responsibility for his crime, and the Government questions how he can be reformed. Mr. Hamman claims that his lengthy history of misbehavior came to a halt with his completion of several BOP programs, but the Government maintains that too little time has passed to judge the efficacy of these programs for Mr. Hamman.

In reply, Mr. Hamman submitted a seven-page handwritten letter to the Court. Mr. Hamman is intelligent and articulate. He states in his letter that he has taken responsibility for his actions and that he is a reformed man. But nowhere in his letter does Mr. Hamman acknowledge that he committed the crime for which he was convicted and sentenced, after a jury trial in which Mr. Hamman told the jury that the person who robbed the Key Bank was not him and even implied that it could have been the taxi driver. The Court is hopeful that Mr. Hamman has made genuine progress toward turning his life around and will continue to make progress.

Compassionate release is "rare" and "extraordinary," and courts routinely deny such claims. *United States v. Mangarella*, 2020 WL 1291835, at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event.") (citation omitted). Mr. Hamman's situation is not one of those rare cases. His serious concern over the existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, is too speculative to justify a sentence reduction. As the Third Circuit stated in *dicta*, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release[.]" *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

A defendant bears the burden to show special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release. *See United States v.*

PAGE 10 – OPINION AND ORDER

*Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that a defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306-07 (9th Cir. 1998)). As other district courts have noted: "To be faithful to the statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant suffers from . . . chronic conditions that [he] is not expected to recover from. Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release from a defendant suffering from severe back injuries and epilepsy) (brackets in original) (quoting *United States v. Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)). The Court also must consider the sentencing factors under § 3553(a), to the extent they are applicable. *See* § 3582(c)(1)(A) and USSG § 1B1.13.

The Court has considered all the relevant factors for compassionate release. Based on Mr. Hamman's medical condition, the current health situation at USP Tucson, the fact that Mr. Hamman has served only about 50 percent of his sentence, and his extensive criminal history, the Court concludes that Mr. Hamman has not shown special circumstances meeting the high bar set by Congress and the Sentencing Commission for compassionate release.

## CONCLUSION

The Court DENIES Defendant's Motion for Compassionate Release (ECF 188) without prejudice and with leave to seek reconsideration if conditions at USP Tucson change.

**IT IS SO ORDERED.**

DATED this 8th day of June, 2020.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge